## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BENJAMIN A DEBAISE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 09-0591 |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION

**NORA BARRY FISCHER, District Judge**

### I.    INTRODUCTION

Plaintiff Benjamin A. Debaise ("Plaintiff") brings this action pursuant to 42 U.S.C. §405(g) and §1383(c)(3), seeking review of the final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act. The parties have filed cross motions for summary judgment (Docket nos. 8, 12)pursuant to Federal Rule of Civil Procedure 56, and the record has been developed at the administrative level. For the following reasons, the decision of the ALJ is supported by substantial evidence and Plaintiff's motion (Docket No. 8) will be denied and Defendant's motion (Docket No. 12) will be granted.

### II.    PROCEDURAL HISTORY

Plaintiff protectively filed his application for DIB on January 25, 2007, alleging disability since June 3, 2005 due to diabetes, vision problems, asthma, bipolar disorder, and cocaine addiction.

Plaintiff's claim was initially denied on March 12, 2007. (Docket No. 6-4 at 2)[1]. He requested a hearing before an Administrative Law Judge ("ALJ") on May 16, 2007. (R. 94-5). A hearing was held on July 1, 2008. (R. 25-64). Plaintiff, who was represented by counsel, appeared and testified at the hearing. (*Id*.) Amy Debaise, Plaintiff's spouse, and Timothy Mahler, a vocational expert, also testified. (*Id*.). On September 30, 2008, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Act. (R. 12-28). The Appeals Council subsequently denied Plaintiff's request for review, thereby making the ALJ's decision the decision of the Commissioner in this case. (R. 1-6). Plaintiff now seeks review of that decision by this Court.

## III. STANDARD OF REVIEW

This Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994).  The Court may not undertake a de novo review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 522, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988). As long as the

---

[1]

Hereinafter, all citations to Docket No. 6, the Certified Copy of the Transcript of the Proceedings Before the Social Security Administration will be of the form "(R. __)".

Commissioner's decision is supported by substantial evidence, it cannot be set aside, even if the reviewing court "would have decided the factual inquiry differently." *Haranft v. Apfel,* 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Sec'y of Health and Human Servs.,* 841 F.2d 57, 59 (3d Cir. 1988); 42 U.S.C. §423 (d)(1). A claimant is considered unable to engage in substantial gainful activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423 (d)(2)(A).

An ALJ must do more than simply state factual conclusions to support her ultimate findings. *Baerga v. Richardson,* 500 F.2d 309, 312-13 (3d Cir. 1974). The ALJ must make specific findings of fact. *Stewart v. Secretary of HEW*, 714 F.2d 287, 290 (3d Cir. 1983). Moreover, the ALJ must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its rule making authority under 42 U.S.C. §405(a), has promulgated a five-step sequential evaluation process to determine

whether a claimant is "disabled" within the meaning of the Act.  The United States Supreme Court

summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further.  At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520 (b), 416.920 (b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." [20 C.F.R.] §§ 404.1520(c), 415.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. [20 C.F.R.] §§ 404.1520(d), 416.920(d).  If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. [20 C.F.R. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-5, 124 S.Ct. 176, 157 L.Ed. 2d 333 (2003)(footnotes omitted.)

If the claimant is determined to be unable to resume previous employment, the burden shifts

to the Commissioner (Step 5) to prove that, given the claimant's mental or physical limitations, age,

education, and work experience, he or she is able to perform substantial gainful activity in jobs

available in the national economy. *Heckler v. Campbell*, 461 U.S. 458, 461 (1983); *Stunkard*, 842

F.2d at 59; *Kangas*, 823 F.2d 775, 777 (3d Cir. 1987); *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir.

1986).

## IV. FACTS

**A. General Background**

Plaintiff was born on March 9, 1975. (R. 28). Plaintiff was thirty-one years old on the date he filed his application for DIB, and was thirty-four at the time of his hearing before the Administrative Law Judge ("ALJ"). (R. 13, 28). Plaintiff completed high school and two or three years of college. (R. 28, 40). Plaintiff's past relevant work can be generally classified as unskilled manufacturing and restaurant labor. (R. 132-36). Examples of Plaintiff's job titles during this period include: machine-operator, assembler, cook, bartender, fast food restaurant manager, kitchen manager/supervisor, and bouncer. (*Id.*). Starting in January of 2007 after being fired from the last job he held, Plaintiff claims he was unable to work full-time because of "issues dealing with stress" that exacerbated a bipolar disorder and low blood sugar related to diabetes (R. 47). Plaintiff has remained unemployed since January 3, 2007. (Docket No. 9 at 3). Plaintiff alleges the following conditions preclude him from gainful employment: diabetes, vision problems, asthma, bipolar disorder, and cocaine addiction. (Docket No. 9 at 2).

**B. Medical History**

Plaintiff is approximately 6'5" tall and weighs approximately 300 pounds. (R. 285, 593). His family history includes drug and alcohol abuse, and his father was also treated for mental illness. (R. 212, 617). His own medical history is complex, and marked by substance abuse. Plaintiff suffered from asthma, Type 1 Diabetes (diagnosed at the age of fourteen), and bipolar disorder for an uncertain period prior to his application for DIB. (R. 213). His problems with substance abuse include crack cocaine, marijuana, and painkillers since 1992. (R. 446).

5

The earliest medical records available indicate that Plaintiff completed an inpatient treatment program from July 30, 2002 to August 6, 2002 at the Greenbriar Treatment Center, a free-standing drug and alcohol treatment facility. (R. 199). Then, on March 6, 2003, Plaintiff was admitted to the ICU at Saint Vincent Health Center, as a transfer from Titusville Hospital, for a drug overdose and was seen by Dr. Elizabeth Pollard. (R. 212). Plaintiff gave a history indicating that he had been in rehabilitation for cocaine and marijuana abuse in the past. (R. 221). Per Dr. Pollard's orders, Plaintiff remained in the hospital for several days for observation. (R. 222).

On July 10 of that year, after he fell while at work and broke a rib, Plaintiff was seen by Dr. Arthur Lewis at the Titusville Area Hospital. (R. 268-76). Dr. Lewis filled out and signed a report that temporarily restricted the type and amount of work that Plaintiff could perform. (*Id.*).

Plaintiff saw Dr. C.E. Fougerousse, a psychiatrist at Sunbridge Health in State College, PA, for therapy from January of 2004 to April of 2006. (R. 278-83). Dr. Fougerousse's notes of their eleven sessions in that time document Plaintiff's mood changes, insomnia, cocaine use, difficulty achieving orgasm, and record numerous adjustments in his course of medications, including prescriptions for: Depakote ER, Lexapro, Abilify, Trazodone, Zyprexa, Lamictal, Effexor XR (*Id.*).[2]

Plaintiff had a consultation with Dr. Rick D. Pasquariello on May 28, 2004. (R. 286-87).

---

[2] Depakote is used to treat various types of seizure disorders and also to treat the manic phase of bipolar disorders. Lexapro and Effexor are SSRIs (selective serotonin reuptake inhibitors) used as antidepressants. Abilify (aripiprazole) is an antipsychotic, also used to treat major depressive disorders. Trazodone is an antidepressant, also used for relief of anxiety disorders. Zyprexa is an atypical antipsychotic, used to treat schizophrenia and bipolar disorder. Lamictal is an anti-epileptic medication, also used to delay mood episodes in adults with bipolar disorder. http://www.drugs.com (*last visited February 3, 2010*).

During this appointment Plaintiff explained that he had a rib fracture from his fall at work, that he was in persistent pain despite the Percocet he received at the emergency room, especially when he took deep breaths, and that he was feeling nauseous. (*Id.*). Dr. Pasquariello prescribed a Duragesic patch. (*Id.*)[3]

Plaintiff then saw Dr. Jan S. Ulbrecht on June 25, 2004 in the hopes of beginning insulin pump therapy for his diabetes. (R. 285-86). Since this was Plaintiff's initial visit, Dr. Ulbrecht decided to monitor Plaintiff's health while on his current diabetes treatment before determining whether Plaintiff needed the pump. (*Id.*).

Although Plaintiff was supposed to have a follow-up visit with Dr. Ulbrecht in one week, Plaintiff did not return until January 7, 2005, stating that he had obtained a new job and had thought that he was not permitted to take time off from work for doctor appointments. (R. 296-97). Dr. Ulbrecht remained hesitant to start Plaintiff on insulin pump therapy until he had further monitored Plaintiff's health and until Plaintiff was more responsible about monitoring it himself. (*Id.*). Dr. Ulbrecht discussed Plaintiff's binge eating and weight gain and Plaintiff told the doctor that he would make an appointment in the next week with Lynn Parker Klees, R.D., M.S., C.D.E., who has expertise in binge eating.

Plaintiff had a follow-up visit on January 28, 2005, to check his blood sugar level, which he had been monitoring since his last appointment.(R. 295).  Dr. Ulbrecht ordered Plaintiff to have blood tests done after this visit in order to continue monitoring his diabetes. (*Id.*). A second follow-

---

[3]

Duragesic is a narcotic (opioid) pain medicine.  The Duragesic skin patch is used to manage chronic pain.  http://www.drugs.com (*last visited February 3, 2010*).

up occurred on April 29, 2005, when Dr. Ulbrecht commented that Plaintiff had been testing and recording his blood sugar levels twice a day, which showed high variability. (R. 294). Dr. Ulbrecht told Plaintiff to keep a food diary of his daily food intake and set up an appointment for the next week so Plaintiff could discuss his binge eating with Ms. Klees, with whom he had still not met. (R. 294). A third follow-up visit occurred on May 9, 2005, where Dr. Ulbrecht and Plaintiff reviewed Plaintiff's blood sugar levels, Plaintiff discussed managing his binge eating with Ms. Klees, and Dr. Ulbrecht decided to start pump therapy with the Plaintiff at his next appointment. (R. 293). However, Plaintiff's next appointment with Dr. Ulbrecht was not until August 19, 2005 and was a yearly check-up rather than a follow-up appointment to begin pump therapy. (R. 291). Dr. Ulbrecht noted that Plaintiff is inconsistent in testing his blood sugar levels and taking his insulin. (*Id.*) He reported that Plaintiff had not started pump therapy. (*Id.*). Plaintiff had blood tests after this visit and Dr. Ulbrecht determined that he needed to coordinate with Plaintiff's psychologist in order to best treat him. (*Id.*).

On March 3, 2006, Plaintiff was seen by Michael J. Talone, OD, of the Nittany Eye Associates, for a routine diabetic eye evaluation, and Dr. Talone reported to Dr. Pasquariello that Plaintiff was "doing well" in April of that year. (R. 621).

Plaintiff did not return to see Dr. Ulbrecht until June 30, 2006. (R. 301). Plaintiff reported that since his previous visit he had been put on Synthroid and had been hospitalized in UPMC Western Psychiatric Institute, but no records of that hospitalization are in the record.[4] (*Id.*). Dr.

---

[4]

Synthroid is a synthetic replacement for a hormone that is normally produced by the thyroid gland to regulate the body's energy and metabolism. http://www.drugs.com (*last visited February 3, 2010*).

Ulbrecht continued to report that the best treatment for Plaintiff would be to coordinate treatment methods with Plaintiff's psychologist or psychiatrist and to further monitor Plaintiff to decide whether he could handle insulin pump therapy. (*Id.*).

On August 1, 2006, Dr. John Boswell saw Plaintiff for a psychiatric consultation. (R. 622). Dr. Boswell reported his findings on Plaintiff's psychological conditions associated with his bipolar disorder to Dr. Pasquariello, including mood swings, manic episodes, and binge eating, and he started Plaintiff on a "trial on Lithium in combination with Depakote."[5] (R. 622-23).

Plaintiff failed to make his scheduled follow-up appointment with Dr. Ulbrecht and did not return until August 14, 2006. (R. 303). Dr. Ulbrecht noted that Plaintiff had started to see Dr. Boswell and that Plaintiff's "diabetes self-care is basically atrocious." (*Id.*).

Plaintiff then returned to Dr. Pasquariello on August 15, 2006, to treat a rash that had developed after being prescribed Lithium and Ativan by Dr. Boswell.[6] (R. 302). Dr. Pasquariello told Plaintiff to discontinue use of Lithium and to use over-the-counter medicines like Benadryl and Claritin pm Pruritus to treat the rash. (*Id.*).

Plaintiff saw psychologist Dr. Dennis W. Kreinbrook, Ph.D. and others at Kreinbrook Psychological Services sporadically from October 24, 2006 to February 23, 2007, for his bipolar disorder. (R. 378-97). They recorded Plaintiff's past drug use, his father's bipolar disorder, and Plaintiff's mood swings over the course of their appointments; he continually adjusted Plaintiff's

---

[5]

Lithium is used to treat the manic episodes of manic depression. http://www.drugs.com. (*last visited February 3, 2010*).

[6]

Ativan is a benzodiazepine used to treat anxiety disorders. http://www.drugs.com. (*last visited February 3, 2010*).

medications, and reported that Plaintiff scored 50-41, indicating "serious symptoms or serious impairment in functioning," on the Global Assessment of Functioning Scale.[7] (*Id.*).

At this time, Plaintiff also saw Dr. Stephen Kowalyk for treatment of his diabetes. (R. 350-66). Dr. Kowalyk kept a record of the Standards of Care for Diabetes Mellitus over the six times he saw Plaintiff from November 1, 2006 to August 27, 2007. (R. 355-66). He recorded information such as Plaintiff's height and weight, his LDL and HDL cholesterol levels, his triglycerides, and his HGB A1C (hemoglobin associated with diabetes) levels. (*Id.*).

Plaintiff saw an internal medicine physician, Dr. Steven E. Mills around the same time on two occasions, November 22, 2006 and December 11, 2006, in connection with feeling shaky from diabetes. (R. 342-49). At the follow-up visit on December 11, 2006, Dr. Mills ordered that Plaintiff have an EKG, which found that his "sinus rhythm [was] within normal limits." (*Id.*).

Plaintiff next saw Dr. Alexandre Dombrovski, a psychiatrist at Kreinbrook Psychological Services, as an outpatient from December 2, 2006 to April 9, 2008. (R. 568-90). Dr. Dombrovski

---

[7]

The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation . . . .)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., . . . suicidal preoccupation)" or "inability to function in almost all areas . . .; of 20 "[s]ome danger of hurting self or others . . . or occasionally fails to maintain minimal personal hygiene . . . or gross impairment in communication." *Id.*

recorded Plaintiff's medical history, noting chronic depression, insomnia, cocaine use relapse, his later abstinence from using cocaine, second relapse, further abstinence from cocaine use, and Plaintiff's ECT therapy[8] after his fifth suicide attempt. (*Id.*). Throughout the period of time in which Plaintiff sought treatment, Dr. Dombrovski prescribed and adjusted the dosages of numerous drugs, including: Geodon, Depakote, Cymbalta, Rozerem, Synthroid, Levitra, Humalog, Benadryl, Ativan, Prilosec, Lantus, Lisinopril, and Sonata.[9] (*Id.*).

Meanwhile, the Mutual Aid Ambulance Service was repeatedly called to assist Plaintiff during moments of crisis at home: first, on December 12, 2006, by Plaintiff's wife because Plaintiff was unresponsive when she tried to wake him. (R. 526). The EMTs checked his glucose level, monitored his heart, and gave him Dextrose, but Plaintiff refused to be transported to the hospital. (R. 527).

Plaintiff saw David Green, OD for an eye examination on December 18, 2006. (R. 370-73). Plaintiff was thus diagnosed with myopia and astigmatism in both eyes and as being at risk for glaucoma. (*Id.*).

---

[8]

"Electroconvulsive therapy (ECT) is a procedure in which electric currents are passed through the brain, deliberately triggering a brief seizure. This seems to cause changes in brain chemistry that can alleviate symptoms of certain mental illnesses." http://www.mayoclinic.com/health/electroconvulsive-therapy/MY00129, (*last visited February 3, 2010*).

[9]

Geodon is an antipsychotic, used to treat schizophrenia and the manic symptoms of bipolar disorder. Cymbalta is an antidepressant. Rozerem is a sedative used to treat insomnia. Levitra is used to treat erectile dysfunction. Humalog is an insulin treatment for diabetes. Prilosec is used to decrease the acid produced in the stomach. Lantus is an artificial form of the insulin hormone used to decrease glucose levels in blood. Lisinopril is an ACE inhibitor, used to treat high blood pressure. Sonata is a sedative used to treat insomnia. http://www.drugs.com, (*last visited February 3, 2010*).

On December 19, 2006, Plaintiff admitted himself to Westmoreland Hospital for an acute pain in his right knee. (R. 435-40). The treating physician, Dr. Mark Persin, prescribed Vicodin and discharged Plaintiff. (*Id.*).

On February 21, 2007, Plaintiff returned to internal medicine physician, Dr. Mills, complaining of a sinus infection. (R. 597). Dr. Mills prescribed Augmentin, Sudafed, and Mucinex DM. (*Id.*).

The Mutual Aid Ambulance Service was called for a second time on March 1, 2007, for a diabetic emergency. (R. 529-30). Plaintiff was in an altered state and "staggering all over" his porch. (*Id.*). He also had "large amounts of saliva running out of his mouth," was "very diaphoretic" (sweating profusely), and became "aggressive and violent" when approached by the EMTs. (*Id.*) The EMTs checked Plaintiff's glucose levels after some difficulty and provided Dextrose. (*Id.*). Plaintiff refused further treatment. (*Id.*).

Plaintiff returned to Dr. Mills on March 9, 2007, complaining of a cough and chest congestion that he had been suffering from for two to three weeks. (R. 596).   Dr. Mills prescribed Amoxil and continuation of the medications from the last visit, and he advised Plaintiff to get plenty of fluids and to call for a follow up appointment if he was not better in one to two weeks. (*Id.*).

On March 12, 2007, Plaintiff met with Dr. Schiller, Ph. D. for a Mental Residual Functional Capacity Assessment and a Psychiatric Review Technique. (R at 402-417). Dr. Schiller found that Plaintiff was not significantly limited or only moderately limited in all categories. (*Id.*).  He further found that Plaintiff had two medical impairments: Bipolar I Disorder and Cocaine Dependence in Full Remission.  (R. 404).  He also found that Plaintiff was able to carry out very short and simple

12

instructions and appeared to be "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairments." (*Id.*).

On March 9, 2007 and again on March 19, 2007 Dr. Kowalyk ordered various tests of Plaintiff's blood, with the following results on March 9: 0.34 Testosterone Free, Cholesterol of H228 with increased risk of CHD, Triglyceride of H229, LDL of H135, HDL of L47, and CHOL/HDL ratio of 4.9. (R. 487-97). On March 19, 2007, Plaintiff had a result of 0.57 Testosterone Free (below the normal range), and results in the normal ranges for LH, FSH, and TSH (pituitary hormone levels). (*Id.*).

On April 7, 2007, Plaintiff admitted himself to the UPMC Western Psychiatric Institute and Clinic because of homicidal and suicidal ideation, and upon admittance he reported that he had lapsed and had been using oxycontin, alcohol, and crack cocaine for three weeks. (R. 441-58). He was discharged on April 16, 2007. (*Id.*).  The discharge summary noted "marked improvement" in Plaintiff's condition from when he was admitted. (*Id.*). At discharge, Plaintiff was prescribed Synthroid, Claritin, Cymbalta, Depakote, Vistaril,[10] Geodon, Lispro insulin, Levamir insulin, and Humalog insulin. (R. 444).

On April 16, 2007, upon discharge from UPMC Western Psych, Plaintiff was admitted for inpatient multidisciplinary treatment to the White Deer Run/Cove Forge Behavioral Health System. (R. 628-29). He was treated under the dual diagnosis program, but was medically discharged on April 30, 2007, because of "complications associated with the patient's foot injury in association

---

[10]

Vistaril is an antihystamine and an antidepressant. http://www.drugs.com, (*last visited February 3, 2010*).

with him being a diabetic." (*Id.*). At discharge Plaintiff was diagnosed with cocaine dependence, bipolar disorder, insulin dependent diabetes mellitus, hypothyroidism, and allergic rhinitis.[11] (*Id.*). Plaintiff's prognosis was described as "guarded," though his treating physician and counselor agreed that his prognosis would improve were Plaintiff to abstain from using cocaine, to "follow through with outpatient counseling, and [to] attend twelve step meetings on a regular basis."(*Id.*).  Plaintiff was "referred to Gateway Greensburg for outpatient drug and alcohol counseling with his first appointment being on May 7, 2007." (*Id.*).  There is no record of his attending said appointment.

On May 1, 2007, Plaintiff saw Dr. Mills again, this time in regards to asthma and in-grown toenails. (R. 595). Dr. Mills prescribed Advair and Singulair for the asthma problem and advised Plaintiff to see a podiatrist about his in-grown toenails and to schedule a follow-up appointment after he was seen by a podiatrist. (*Id.*). Plaintiff had a follow-up appointment on May 8, 2007. (R. 594).

Plaintiff saw a podiatrist, Gregory C. Spain, DPM, on May 1, 2007, for his in-grown toenails. (R. 636). Dr. Spain diagnosed Plaintiff with chronic in-grown toenails on both borders of both great toes, which he removed that day during an in-office surgery. (*Id.*). Plaintiff was directed to re-dress the wounds daily and return for a follow-up visit in a week. (*Id.*)

Plaintiff went to the emergency room at Westmoreland Hospital on June 1, 2007, due to shortness of breath, wheezing, and a cough. (R. 462). He opted for outpatient steroid therapy rather than staying and ended up in the hospital again the following night because his breathing had become

---

[11]

Hypothyroidism is diminished production of thyroid hormone leading to clinical manifestations of thyroid insufficiency, including low metabolic rate, tendency to gain weight, somnolence, and sometime myxedema.  Allergic Rhinitis is an allergic inflammation of the nasal mucous membrane. STEDMAN'S MEDICAL DICTIONARY 939, 1690 (28th ed. 2006)

worse. (*Id.*). Plaintiff was treated with Solu-Medrol, albuterol, and an Atrovent nebulizer.[12] (*Id.*). Plaintiff was transferred to Skilled Care on June 6, 2007 for "asthma exacerbation and continued medication treatment." (R. 470-71). On June 9, 2007, Plaintiff was switched from his previous treatment medications to oral Prednisone therapy.[13] (*Id.*). Plaintiff was discharged the next day because of a death in the family, and "he appeared to have no respiratory distress at the time of discharge." (*Id.*).

Plaintiff returned to Westmoreland Hospital on June 13, 2007, complaining that the pain in his knee had returned. (R. 472-83). The physician that saw Plaintiff, Dr. Michelle Belak, prescribed Vicodin for the pain and discharged him. (*Id.*).

Plaintiff had an MRI of the brain and pituitary conducted on July 3, 2007; the impression given was of a normal MRI of the brain and no pituitary abnormalities were demonstrated. (R. 486).

Plaintiff returned to Dr. Kowalyk on August 20, 2007 for more tests, resulting in a Testosterone Total of 206, Testosterone % Free of 0.30 (below the normal range). (R. 501-02).

On October 6, 2007, Plaintiff was referred to UPMC Western Psych for ECT by Dr. Dombrovski. (R. 519). He reported that he was in a depressed phase of his bipolar disorder, that he was injuring himself, and had suicidal ideation. (*Id.*). He also reported that he had been "clean and sober" since his discharge from UPMC Western Psych in April. (*Id.*). He had five applications

---

[12]

Solu-medrol is used to treat conditions associated with decreased adrenal functioning and is an anti-inflammatory. Albuterol is a bronchodilator that expands the airways to the lungs. Atrovent is used to prevent bronchospasms and narrowing of the airways. http://www.drugs.com, (*last visited February 3, 2010*).

[13]

Prednisone is a corticosteroid, used to prevent inflammation. http://www.drugs.com, (*last visited February 3, 2010*).

of ECT as an inpatient which were beneficial and which he tolerated well, before his discharge on October 22, 2007.  (R. 514-23).

But, the Mutual Aid Ambulance Service was called for a third time on October 27, 2007, because Plaintiff was in an altered state and was hypoglycemic. (R. 531-34).  The EMT crew assessed his vitals, checked his glucose level, and gave him Dextrose. (*Id.*). Plaintiff refused to be taken to a hospital. (*Id.*).

The Mutual Aid Ambulance Service was called for a fourth time on November 19, 2007, because Plaintiff was again in an altered state and hypoglycemic. (R. 535-38). The EMT crew again assessed his vitals, checked his glucose level, and gave him Dextrose. (*Id.*). Plaintiff again refused to be taken to a hospital. (*Id.*).

The Mutual Aid Ambulance Service was called for a fifth time on December 12, 2007, this time because Plaintiff was involved in a multi-vehicle car accident and was experiencing pain in the right side of his chest and abdomen. (R. 539-40). The Ambulance Service took Plaintiff to Westmoreland Regional Hospital. (R. 550-51). At the hospital, Plaintiff complained of pain in the left iliac crest and pelvis. (R. 555-56). The treating physician gave Plaintiff two single doses of Dilaudid 1mg at different times. (*Id.*). The physician also ordered x-rays of his chest and pelvis, a cervical spine series, and a CT scan of his chest. (*Id.*). Plaintiff was discharged from the hospital on the same day and instructed to schedule a follow-up appointment with his primary care physician, Dr. Mills. (R. 557). Plaintiff was prescribed Flexeril, Ibuprofen, and Vicodin, and was given a note excusing him from work until December 15, 2007.[14] (*Id.*).

---

[14]

Flexeril is a muscle relexant, used to treat pain. http://www/drugs.com, (*last visited February*

Plaintiff returned to Westmoreland Hospital on December 15, 2007, because of increased pain to his chest and abdomen. (R. 545). The treating physician diagnosed Plaintiff with acute bronchitis and contusions to his sternum, upper abdominal wall, right hip and iliac crest, and left hip and iliac crest from the car accident. (*Id.*). There were no acute abnormalities seen on the x-rays ordered by the treating physician. (*Id.*). Plaintiff was discharged that day, prescribed Tessalon Perles, Percocet, and Ibuprofen, and instructed to schedule a follow-up appointment with Dr. Mills.[15] (R. 546).

Though Plaintiff had blood tests done at Excela Health Westmoreland Hospital, on January 7, 2008 (R. 633-34), he did not see Dr. Mills until April 18, 2008, with complaints of sinus and chest congestion. (R. 593). Dr. Mills prescribed Augmentin and Claritin. (*Id.*). Five days later, Plaintiff was admitted to Excela Health Westmoreland Hospital for symptomatic hypoglycemia and acute exacerbation of asthma secondary to purulent bronchitis. (R. 598-611). Plaintiff was given intravenous Solu-Medrol, tapered to Prednisone and later Levaquin, while hospitalized to treat his asthma/bronchitis. (*Id.*). His blood sugar levels were also monitored during this time and Plaintiff was ordered to be on oxygen at night to help him sleep better. (*Id.*). Upon discharge on April 25, 2008, he was diagnosed with:

> acute asthma exacerbation secondary to pleural bronchitis, diabetes mellitus with
>
> hemoglobin A1C of 6.7, insulin-dependent diabetes mellitus, hypothyroidism,

---

*3, 2010*).

[15]   Tessalon Perles is a non-narcotic cough medicine. Percocet is a pain-reliever. http://www.drugs.com, (*last visited February 3, 2010*).

hypercholesterolemia, history of asthma, history of seasonal allergic rhinitis, history

of bipolar disorder, undergoing ECT therapy between December and February,

lithium allergy resulting in rash, mild nocturnal hypoxemia on room air, and obesity.

(R. 600). Plaintiff was prescribed Albuterol nebulizing treatments, Depakote, Synthroid, Zetia,

Geodon, Albuterol MDI, Levaquin, Prednisone taper, Levemir, Novolog 42 units, Tums, and a

Glucagon Kit. (*Id.*). He was also assigned a "low calorie, fat, cholesterol, salt, sugar, and bread

consistent with a diabetic diet." (R. 599). Plaintiff was told to follow-up with Dr. Mills in one to two

weeks. (*Id.*).

On May 10, 2008, Dr. Dombrovski, a psychiatrist, submitted a Medical Report evaluating

Plaintiff's illnesses and treatment to Plaintiff's attorney. (R. 615-20). Dr. Dombrovski noted that

Plaintiff suffers from insomnia and severe depression that at times leads to thoughts of suicide. (*Id.*).

He recorded Plaintiff's history of using marijuana and alcohol from the age of ten or eleven. (*Id.*).

Plaintiff started to use powder cocaine during his junior year of college. (*Id.*). Since he started using

cocaine, Plaintiff has quit using and relapsed several times, with the last relapse occurring in

February of 2008. (*Id.*). Dr. Dombrovski diagnosed Plaintiff with Bipolar I Disorder, cocaine

dependence in early remission, THC abuse, alcohol dependence in full sustained remission,

Intermittent Explosive Disorder, Diabetes Mellitus Type I, Hypothyroidism, Hypogonadism, obesity,

problems with primary support group: separated from wife, occupational problems: unemployed, and

economic problems: low income. (*Id.*). Dr. Dombrovski believed that Plaintiff's bipolar disorder was

"difficult to treat" and could only be treated effectively through "electroconvulsive therapy and

combination medication treatment and that [Plaintiff] will experience future periods of

18

decompensation." (*Id.*). The report also noted that Plaintiff was at "significant risk for recurrence of his substance dependence and suicide attempts." (*Id.*). Dr. Dombrovski stated in the report that Plaintiff had "difficulties in maintaining social functioning," "difficulties in maintaining concentration and task persistence," and repeated episodes of decompensation. (*Id.*).

On May 21, 2008, Dr. Dombrovski submitted a supplemental report answering questions from Plaintiff's attorney. (R. 612-14). Dr. Dombrovski stated that Plaintiff's "diagnosis of Bipolar I Disorder does not depend on his substance use." (Docket No. 6-11 at 47). He further stated that even if Plaintiff recovered from substance use, Plaintiff "will continue to experience problems with social functioning due to anger outbursts and repeated periods of decompensation due to periods of depression and, possibly mania." (Docket No. 6-11 at 48). He stated that drug and alcohol abuse are not the result or cause of Plaintiff's Bipolar I diagnosis. (*Id.*). Dr. Dombrovski stated that, "rather than being a result of his bipolar illness, it should be seen as stemming from some shared vulnerability. In other words, some of the same genetic and environmental factors may be causing both bipolar disorder and substance use." (*Id.*).

### C. Administrative Hearing and ALJ Decision

Plaintiff appeared and testified at the administrative hearing on July 1, 2008. (R. 37-84). Plaintiff testified that he was employed up until his termination on January 3, 2007, by his employer who was concerned with how Plaintiff was performing while taking the medication Geodon. (R. 43). Plaintiff alleged that the combination of his medical conditions has prevented him from obtaining gainful employment. (R. 40). Plaintiff stated that the combined conditions include Diabetes type I, asthma, bipolar disorder, and cocaine addiction. (R. 47-48 and 55). Plaintiff stated that he had "issues

19

dealing with stress," not just because of the mood swings he would undergo due to his bipolar disorder but also because he has low blood sugar when stressed out. (R. 48). Plaintiff further stated that he had to miss many days of work to attend doctor appointments to treat his various conditions. (R. 48-49). Although Plaintiff testified that he cannot obtain gainful employment due to his conditions, he explained that he can still perform everyday household chores, such as vacuuming, doing laundry, mowing the lawn, and shoveling snow. (R. 67-68).

In regards to his past work experience, Plaintiff testified that from late 2005 to early 2006 he assembled ultrasound and sonogram machines. (R. 45). He also testified that he worked from the summer to winter of 2006 as a kitchen manager at a restaurant. (R. 44). After working at the restaurant, Plaintiff stated that he worked as a machine operator until he was fired on January 3, 2007. (R. 42-43).

A Vocational Expert ("VE"), Tim Mahler, evaluated Plaintiff's ability to work at the administrative hearing. (R. 79-84). Basing his report on the Plaintiff's work history, Mr. Mahler testified that someone with the restrictions listed in a hypothetical question[16] by the ALJ would be unable to perform the past jobs listed in Plaintiff's work history report. (R. 82-83). However, Mr.

---

[16]
Specifically, the ALJ asked about:
an individual with this claimant's education, training, and work background who is able to do medium work but is limited to concentrated exposure to odors, fumes, dusts, gasses, chemical irritants, environments with poor ventilation, hot cold temperature extremes, extreme dampness or humidity; is limited to simple, routine, repetitive tasks not performed in a fast paced production environment involving only simple work related decisions and in general relatively few work place changes; and limited to occasional interaction with supervisors, co-workers, and members of the general public.
(R. 81)

20

Mahler went on to list jobs in the local and national economy at light and medium exertional levels that Plaintiff could perform, such as hand packer, material handler, janitor, stock clerk, labeler and maker, laundry folder, and office cleaner. (R. 83-84). Additionally, Mr. Mahler testified that more than one absence a month from such jobs would result in termination. (R. 84).

The ALJ determined that Plaintiff's medically determinable impairments did not meet the requirements for receipt of disability insurance benefits and that Plaintiff would not be disabled if he stopped the substance abuse. (R. 29). Accordingly, the ALJ found that Plaintiff has not been under disability, as defined by the Social Security Act, since his alleged onset date of June 30, 2005. (R. 29).

## V. DISCUSSION

The ALJ, Patricia C. Henry, concluded that the Plaintiff was not disabled as defined by the Social Security Act. The ALJ reached this decision after applying the five step framework for analysis summarized in *Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003).

### A.    The Five Step Analysis

Under the first step, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since June 30, 2005, the alleged onset date. (R. 14). At step two, the ALJ determined that Plaintiff suffered from severe impairments under the standards set forth in 20 C.F.R. §§ 404.1520(c). (R. 15). Specifically, the ALJ determined that Plaintiff suffered from Type I diabetes mellitus, recurrent asthma, bipolar disorder, anxiety, and polysubstance abuse. (*Id.*)

21

In the third step, the ALJ determined that Plaintiff's mental impairments, including the substance abuse, met sections 12.04 (affective disorders), 12.06 (anxiety-related disorders), and 12.09 (substance abuse disorders) of the "Listing of Impairments" at 20 CFR Pt. 404 Subpt. P, App. 1. (*Id.*) Specifically, for section 12.04, the ALJ found that Plaintiff satisfied the "Paragraph A" criteria because he had significant behavioral changes associated with substance abuse, a history of bipolar disorder with both manic and depressive episodes, and a history of generalized persistent anxiety accompanied by motor tension, autonomic hyperactivity, and apprehensive expectation. (*Id.*)[17] The ALJ found that the "Paragraph B" criteria were also met because Plaintiff's mental impairments, including the substance abuse, caused a "marked" restriction in maintaining social functioning and because he experienced repeated episodes of decompensation.[18] (R. 15-16).

Next, the ALJ repeated steps two and three, but this time considering Plaintiff's limitations if he stopped the substance abuse. Under 42 U.S.C. § 423(d)(2)(C), "[a]n individual shall not be considered to be disabled . . . if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."

---

[17]

The required level of severity for 12.04 affective disorders is met when "the requirements in both A and B are satisfied , or when the requirements in C are satisfied" 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04. Paragraph A is a listing of specific medical requirements.

[18]

Paragraph B requires that the disorder listed in Paragraph A result in "at least two of the following:

　　1. Marked restriction of activities of daily living; or
　　2. Marked difficulties in maintaining social functioning; or
　　3. Marked difficulties in maintaining concentration, persistence or pace; or
　　4. Repeated episodes of decompensation, each of extended duration."

20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ determined that Plaintiff had a marked restriction in the area of social functioning, but only moderate restrictions in the areas of activities of daily living and of concentration, persistence, or pace. (R. 15-16).

In making the determination of materiality, the ALJ was following, without citing to it, Emergency Teletype 96200,[19] a policy instruction issued in 1996 from the Social Security Commissioner to Social Security Adjudicators and ALJs regarding adjudication of cases where the applicant has drug and alcohol abuse ("DAA") issues.  In relevant parts it reads:

> There will be cases in which the evidence demonstrates multiple impairments, especially cases involving multiple mental impairments, where the MC/PC cannot project what limitations would remain if the individuals stopped using drugs/alcohol. In such cases, the MC/PC should record his/her findings to that effect. Since a finding that DAA is material will be made only when the evidence establishes that the individual would not be disabled if he/she stopped using drugs/alcohol, the DE will find that DAA is not a contributing factor material to the determination of disability.
>
> . . . .
>
> We know of no research data upon which to reliably predict the expected improvement in a coexisting mental, impairment(s) should drug/alcohol use stop. The most useful evidence that might be obtained in such cases is that relating to a period when the individual was not using drugs/alcohol. Of course, when evaluating this type of evidence consideration must be given to the length of the period of abstinence, how recently it occurred, and whether there may have been any increase in the limitations and restrictions imposed by-the other mental impairments since the last period of abstinence. When it is not possible to separate the mental restrictions and limitations imposed by DAA and the various other mental disorders shown by the evidence, a finding of "not material" would be appropriate.

(EM-96200, response to questions 27, 29).  The Court of Appeals for the Third Circuit has recently construed this portion of EM-96200 in a non-precedential opinion, holding that the ALJ can make the determination of whether substance abuse is material to the finding of disability based upon her lay interpretation of the medical evidence, without the need for expert psychiatric opinion evidence.

---

[19]

Available at https://secure.ssa.gov.apps10/ (*last visited February 1, 2010*) (follow "EMs" hyperlink; then follow "EM-96200" hyperlink) ("EM-96200").

*McGill v. Commissioner of Social Security*, 288 Fed. Appx. 50, 53 (3d Cir. July 30, 2008) (not precedential).

Accordingly, at step two, the ALJ determined that even if Plaintiff's substance abuse ceased, the remaining limitations would continue to meet the requirements for "severe" impairment as defined in 20 CFR 414.1520(c). (R. 17). Specifically, the ALJ determined that Plaintiff would still suffer from Type I diabetes mellitus, recurrent asthma, bipolar disorder, and anxiety. (*Id.*).

However, at step three, the ALJ determined that if Plaintiff stopped the substance abuse, he would **not** have an impairment or combination of impairments that met or medically equaled any of the impairments listed in 20 CFR Pt. 404 Subpt. P, App. 1 (the "Listing of Impairments"). (R. 17-20). The ALJ found that Plaintiff would no longer meet the Paragraph B criteria because the evidence of record indicated that Plaintiff would only suffer mild restriction in activities of daily living, moderate difficulties in social functioning, moderate difficulties with regard to concentration, persistence or pace, and no episodes of decompensation. (R. 17-19). Because these remaining limitations "would not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation," the ALJ determined that "the 'Paragraph B' criteria would not be satisfied if [Plaintiff] stopped the substance abuse." (R. 19). The ALJ also examined the evidence and determined that Plaintiff did not meet the "Paragraph C" criteria because he would not experience complete inability to function outside the area of his home, had never been diagnosed with social anxiety disorder or agoraphobia, would be able to interact with others, and evidence indicated that he was able to function appropriately socially but for the substance abuse. (R. 19-20).

Next, at step four,  the ALJ determined that if Plaintiff stopped the substance abuse, his residual functional capacity would not allow him to return to his past relevant work (R. 26), but that he would have the residual functional capacity to perform medium work as defined in 20 CFR Pt. 404.1567(c) with some restrictions. (R. 20). Accordingly, at step four the ALJ made the following residual capacity assessment:

> If the claimant stopped the substance abuse, the claimant would have the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except he must avoid concentrated exposure to fumes, odors, dusts, gases, chemical irritants, environments with poor ventilation, hot and cold temperature extremes, and extremes of dampness and humidity, is limited to simple, routine, repetitive tasks, not performed in a fast-paced production environment, involving only simple, work-related decisions, and in general, relatively few work place changes, is limited to occasional interaction with supervisors, coworkers and members of the general public, and is limited to occupations which do not involve the handling, sale or preparation of food or alcoholic beverages or access to narcotic drugs.

(R. 20). The ALJ further found that if Plaintiff stopped the substance abuse, Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible. (R. 21).

Finally, under step five, the ALJ determined that there were jobs existing in significant numbers in the national economy that Plaintiff could have performed. (R. 27). The ALJ relied on the testimony of the vocational expert who testified that an individual with Plaintiff's limitations would be able to perform the requirements of the representative occupations of hand packer, material handler, janitor, and stock clerk. (R. 27). The ALJ further determined that pursuant to SSR 00-4p,

the vocational expert's testimony was consistent with the Dictionary of Occupational Titles. (R. 28). Accordingly, the ALJ found that, since Plaintiff would not be disabled if he stopped the substance abuse, i.e., that the substance abuse disorder was a contributing factor material to the determination of disability, pursuant to 20 CFR Pts. 404.1520(g) and 404.1535. (*Id.*). Therefore, the ALJ determined that Plaintiff was not disabled under the Social Security Act. (*Id.*).

## B. Issues Before This Court

Plaintiff appealed the findings of the ALJ and contends that the ALJ wrongly determined that substance abuse was a contributing factor material to the disability determination. (Docket No. 9, 6). To that end, Plaintiff makes one general argument – that the ALJ gave insufficient weight to the opinions of Plaintiff's treating physician, Dr. Dombrovski – and two specific arguments: that the ALJ wrongly assessed Plaintiff's level of social functioning absent substance abuse, and that the ALJ wrongly determined that Plaintiff would not experience repeated periods of decompensation absent substance abuse. (*Id.* at 6-11). To the contrary, Defendant argues that the ALJ's determination was supported by substantial evidence, that she properly weighed Plaintiff's treating physician's opinions, and that Dr. Dombrovski's opinions are not completely rejected by the ALJ's findings. (Docket No. 13, at 10-11).

## C. Supplemental Material not Presented to the ALJ Cannot be Considered by the Court.

At the outset, the Court notes that Plaintiff relies, in part, on a second Supplemental Report by Dr. Dombrovski dated November 5, 2008, which he submitted to the Appeals Council after the original decision of the ALJ. (Docket Nos. 9 at 8-9; 9-2). As noted above, this Court's review is

limited to determining whether the Commissioner's decision is supported by substantial evidence, and the Court cannot undertake a de novo review of the Commissioner's decision or consider evidence outside the record. 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).   Under 42 U.S.C. § 405(g), "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, . . . may obtain a review of such decision" by a federal district court. Thus, this Court reviews the "final decision" of the Commissioner and is limited to the evidence of record informing that decision.  The Court of Appeals for the Third Circuit has made clear that this review does not encompass evidence presented for the first time to the Appeals Council, when the Appeals Council has denied review and adopted the decision of the ALJ as the final decision, as here, unless the Plaintiff has demonstrated that the new evidence is material and has presented good cause as to why it was not originally presented to the ALJ.  *Matthews v. Apfel*, 239 F.3d 589, 595 (3d Cir. 2001).  Plaintiff has not presented any evidence or argument showing good cause as to why Dr. Dombrovski's second Supplemental Report (Docket No. 9-2) was not presented to the ALJ, and the Court notes that it is dated November 5, 2008, after the ALJ's decision, and appears to have been produced at the request of Plaintiff's counsel specifically for the Appeals Council's review. Therefore, this Court will not consider Dr. Dombrovski's Supplemental Report in its review of the Commissioner's final decision.

### D.   The ALJ Did Not Improperly Reject the Opinion of Plaintiff's Treating Physician.

Even discounting the second Supplemental Report, Plaintiff argues that the ALJ failed to properly consider the opinion of Dr. Dombrovski as it was presented to her in his Report and his first

Supplemental Report. (Docket No. 9 at 5). Plaintiff states that the ALJ "did not adequately consider the opinions of Plaintiff's treating psychiatrist, Dr. Dombrovski [that] Plaintiff's bipolar disorder was independent of his substance abuse issues and that Plaintiff would still have problems in social interaction and repeated episodes of decompensation even while he abstained from substance abuse."[20] (*Id.*). Further, Plaintiff argues that the ALJ failed to support her conclusion rejecting Dr. Dombrovski's opinion with contradictory medical evidence in the record. (*Id.* at 6).

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (*quoting Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)); *see also Allen v. Bowen*, 881 F.2d 37, 41 (3d Cir. 1989); *Podedworney v. Harris*, 745 F.2d 210, 217-18 (3d Cir. 1984). "An ALJ may not simply ignore the opinions of a competent, informed, treating physician. A finding . . . which conflicts with such an opinion and is made without analytical comment or record reference to contradictory evidence is not supported by substantial evidence." *Gilliard v. Hecker*, 786 F.2d 178, 183 (3d Cir. 1986). Thus, as Plaintiff argues, where the consulting/examining physician's report constitutes the only probative medical evidence on the condition in question, it may be entitled to great or even controlling weight. *See Reid*

---

[20]

In this characterization of Dr. Dombrovski's opinion, Plaintiff appears to draw upon not only the Report and Supplemental Report, but also Dr. Dombrovski's second Supplemental Report (Docket No. 9-2). As discussed above, that report is not part of the record available to the Court for review. Therefore, the Court will consider Dr. Dombrovski's opinions as contained in his initial reports, that were actually submitted to the ALJ (R. 612-20), rather than this general characterization of them.

*v. Chater*, 71 F.3d 372, 374 (10th Cir. 1995) (examining physician's report accorded significant weight where it was the only medical assessment on point and corroborated by other evidence). Similarly, Plaintiff points out that examining physician's reports that rest on objective clinical test results may be entitled to significant or controlling weight. *See Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). However, a treating physician's medical opinion is not entitled to controlling weight where it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or is "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. Pt. 404.1527(d)(2).

The Court notes that the ALJ did not, in fact, completely reject the opinion of Dr. Dombrovski. Plaintiff argues that the "ALJ failed to fully consider Dr. Dombrovski's opinion that Plaintiff's bipolar disorder was independent of his substance abuse issues, and that Plaintiff would still have problems in social interaction and repeated episodes of decompensation even when he abstained from substance abuse." (Docket No. 9, 5). Dr. Dombrovski's Supplemental Report of May 21, 2008 addresses this issue in response to questions from Plaintiff's attorney; it states in full:

1.   Is Mr. DeBaise's former and potential drug and alcohol abuse a substantial contributing factor in his Bipolar I diagnosis?

Manic phases of bipolar illness can trigger drug use. Furthermore, there is a high co-occurence of bipolar disease and substance use disorders. However, for Mr. DeBaise diagnosis of bipolar I disorder does not depend on his substance abuse.

2.   Would Mr. DeBaise continue to experience the same functional and occupational limitations absent his drug and alcohol use?

Even if recovered from substance abuse, Mr. DeBaise will continue to experience problems with social functioning due to anger outbursts and repeated periods of decompensation due to periods of depression and, possibly, mania.

29

3.      Is the drug and alcohol abuse a result of Mr. DeBaise's Bipolar I diagnosis or
        a cause of it?

Substance use is certainly not the cause of Mr. DeBaise's bipolar illness.  Rather than
being a result his bipolar illness, it should be seen as stemming from shared
vulnerability.  In other words, some of the same genetic and environmental factors
may be causing both bipolar disorder and substance use.

(R. 614). The ALJ did not completely reject this opinion; nor did she disagree that Plaintiff would

continue to suffer from symptoms of bipolar disorder absent substance abuse, including some

problems with social functioning.  Instead, she opined that Plaintiff would be moderately, rather than

markedly impaired in social functioning when not abusing substances and when compliant with his

prescribed treatment for his mental disorder.  (R. 17-19).[21]  This is not in contradiction with Dr.

Dombrovski's opinion that Plaintiff "will continue to experience problems with social functioning."

(R. 614).  Furthermore, Dr. Dombrovski's opinion does not specify Plaintiff's ability to function

socially while both *not* abusing substances *and* compliant with his prescribed treatment.

However, the ALJ did explicitly reject Dr. Dombrovski's opinion regarding decompensation,

finding that Plaintiff would have no episodes of decompensation if the substance abuse stopped.  (R.

19).  Since Plaintiff objects to both of these findings, the Court will review them for substantial

evidence in the record.

E.      Social Functioning

---

[21]

The Social Security Administration rates the degree of limitation on a "five-point scale:
None, mild, moderate, marked, and extreme." 20 C.F.R. Pt. 404.1520a.  A rating of none, mild, or
moderate generally indicates that the impairment is not severe. *Id*.  "A marked limitation may arise
when several activities or functions are impaired, or even when only one is impaired, as long as the
degree of limitation is such as to interfere seriously with [one's] ability to function independently,
appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App. 1.

The ALJ determined that Plaintiff would have moderate difficulties in social functioning if his substance abuse were stopped. (R. 18). In reaching this determination, the ALJ first considered Dr. Dombrovski's reports discussed above, opining that Plaintiff suffered from a "marked" impairment in social functioning, when considering all of his impairments including substance abuse, and that Plaintiff "would continue to experience problems with social functioning due to anger outbursts even if recovered from substance abuse." (*Id.*). As discussed above, the ALJ's conclusion does not contradict this opinion: continuing to experience problems is consistent with having moderate difficulties. The ALJ did note, however, that Plaintiff's cocaine abuse had only been in remission for about three months when Dr. Dombrovski provided his report, and his opinion indicates "cocaine dependence in early remission" as well as "THC abuse" with no mention of remission. (R. 516-19).

However, the ALJ did not rely only on Dr. Dombrovski's reports. In addition, she considered the record as a whole, paying particular attention to periods when Plaintiff was not abusing drugs. She noted that a review of the medical records for such periods does not reveal references to difficulties with social functioning, and that Dr. Dombrovski and Dr. Kreinbrook, a psychologist, repeatedly report in their progress notes that Plaintiff's affect was cooperative with good eye contact, and their progress notes do not note any inappropriate behavior or problems interacting or communicating in the period from November 15, 2006 to April 9, 2008. (R. 18, citing R. 378-97, 568-90).[22] Plaintiff points to the treatment notes from a November 15, 2006 visit with Dr.

---

[22]

The ALJ's decision refers only to "Dr. Kreinbrook" but this is clearly a clerical error, since she cites to reports by both Drs. Kreinbrook and Dombrovski, and Dr. Dombrovski works at Kreinbrook Psychological Associates.

Kreinbrook, which indicate that, when describing the history of his present illness, Plaintiff complained of homicidal ideation "all the time." (Docket No. 9 at 7; R. 392). However, in the context of Dr. Kreinbrook and Dr. Dombrovski's overall observations of Plaintiff during this time period, it was not improper for the ALJ not to rely on this single statement as dispositive of the question of Plaintiff's social functioning.

Further, the ALJ notes that Dr. Boswell, a psychiatrist, met with Plaintiff in August 2006 and reported that he was open and cooperative with an appropriate affect (R. 18), which is borne out by Dr. Boswell's notes of August 1, 2006 indicating that Plaintiff was "open + cooperative. Affect approp." and recording the impression that Plaintiff had "bipolar I disorder" and "cocaine dependence, in remission." (R. 339). Plaintiff argues that this same course of treatment with Dr. Boswell in August 2006 indicates just the opposite. According to Plaintiff, Dr. Boswell notes that "even when on medication Plaintiff had anger outbursts and threw things" and that "Plaintiff had his worst outburst in a year." (Docket No. 9 at 7). And, while Dr. Boswell's notes do indicate that Plaintiff reported to him that "[h]e'll get pissed off for no apparent reason and will throw the remote," this is in the context of Plaintiff reporting how he "used to be" and immediately after noting that "[o]utbursts are much less frequent and less violent since on meds," and this was the same August 1, 2006 visit when Dr. Boswell noted Plaintiff's open and cooperative affect, and started him on lithium. (R.341). Two weeks later, on August 14, 2006, Dr. Boswell's notes indicate "phone call from pt. . . . Pt feels more on edge + last night had worst angry outburst in a year." However, this is the only mention of the outburst and neither Dr. Ulbrecht, whom Plaintiff saw on August 14, 2006 (R. 303), or Dr. Boswell who saw Plaintiff the next day (R.341) note any behavioral problems.

The ALJ also examined Plaintiff's April 2007 hospital discharge report, stating that he was calm and his mood improved. (R. 18). A review of that hospital discharge report indicates that when plaintiff was *admitted* on April 4, 2007, it was after a three week long relapse into substance abuse ("Oxycontin, crack cocaine, alcohol, and an increased amount of Klonopin") and he evidenced a number of symptoms including: psychomotor retardation, exhaustion, slow speech, poor attention span and concentration, unkempt and disheveled appearance, and a depressed mood, and he reported other symptoms including: feelings of hopelessness and helplessness, anhedonia, episodes of depression, insomnia, and suicidal ideation. (R. 441-42). After nine days in the hospital, and after being placed on medications, he was discharged and his "affect appeared brighter. The patient described his mood as improved. He denied psychotic symptoms. He denied suicidal or homicidal ideation plan or intent." (*Id.*)

When the ALJ considered Plaintiff's hospital records from his October 2007 hospitalization for electroconvulsive therapy at UPMC Western Psych, she noted that the mental status examinations performed at his admission and discharge both indicated that Plaintiff was cooperative. (R. 18). The records from that hospitalization bear this out, indicating that, while his cocaine dependence was only in "early remission" and he was depressed at the time of admission, he was nonetheless "cooperative" at that time and his "mood was good" upon discharge. (R. 516-19). Similarly, the ALJ noted that another mental status examination performed at Westmoreland Hospital when he was admitted for injuries from a car accident in December of that year described his mood and affect as normal. (R. 18). Once again, the record supports this, and his mental status is recorded as: "Normal

ambulatory status.  appropriate mood, affect and behavior. Verbally correct.  not suicidal or homicidal." (R. 543).

Plaintiff points to a report from the Mutual Aid Ambulance Service, which was called to Plaintiff's home around this same period, reporting that the initial responder requested the assistance of a second EMT due to Plaintiff's "combative nature." (Docket No. 9 at 7; R. 532-34).  However, the extent of this "combative nature" seems to have been throwing a mug against the wall after drinking a glass of orange juice, which evidently raised his glucose level and made him amenable to treatment by the EMT, who did not require any external assistance. (R. 532).  It was not error on the part of the ALJ to see this incident as evidence that Plaintiff had less difficulty with social functioning when treating his medical conditions than when they went untreated or when he abused drugs.

Additionally, the ALJ noted that none of the progress notes or reports from physicians treating Plaintiff for physical impairments contain "any references to anger outburst or problems interacting or communicating." (R. 18). Finally, the ALJ found that while Plaintiff and his wife both testified to his difficulties with anger control and anger outbursts, Plaintiff's demeanor at the hearing seemed appropriate and not anxious, and she concluded that "the documentary evidence does not contain any references to observed anger outbursts or problems interacting or communicating when the claimant is not abusing drugs." (*Id.*) Plaintiff argues that this evidence of Plaintiff's demeanor and the ALJ's observations of same during the hearing are irrelevant since Plaintiff's "issues were anger outbursts not sustained anger, as described by Dr. Dombrovski," and that they are "not medical evidence sufficient to reject the opinion of Plaintiff's treating physician." (Docket No. 9 at 8).

34

Here, as throughout his brief, Plaintiff mischaracterizes the ALJ's use of Dr. Dombrovski's opinion on this point.  The ALJ did not reject Dr. Dombrovski's opinion on Plaintiff's level of social functioning absent substance abuse.  As explained above, Dr. Dombrovski's opinion does not state that Plaintiff would experience the *same* level of difficulty with social functioning absent substance abuse as with it.  In fact, although Plaintiff's attorney asked whether Plaintiff would experience "the *same* functional and occupational limitations" absent substance abuse, Dr. Dombrovski carefully opines that Plaintiff would "continue to experience problems with social functioning due to anger outbursts and repeated periods of decompensation due to periods of depression and, possibly, mania," but did *not* answer that they would be the *same*. (R. 614, emphasis added).  Similarly, Dr. Dombrovski's answer that Plaintiff's drug abuse is not the *cause* of Plaintiff's bipolar disorder, was not rejected by the ALJ, either, since the question addressed by the ALJ was not whether Plaintiff's bipolar disorder was caused by drug abuse, but whether the drug abuse exacerbated it, which she found that it did.  In sum, the ALJ did not improperly reject Dr. Dombrovski's opinion, and her determinations with respect to Plaintiff's potential level of social functioning absent substance abuse were supported by substantial evidence.

### E.    Decompensation

In contrast, the ALJ *did* explicitly reject Dr. Dombrovski's opinion regarding the episodes of decompensation that Plaintiff would experience absent drug use.  In his first Report, Dr. Dombrovski opines that, given all of his conditions including the substance abuse, Plaintiff suffered from "[r]epeated episodes of decompensation, each of extended duration: four or more." (R. 619).  In his supplemental report, Dr. Dombrovski opines that Plaintiff would experience "repeated periods

of decompensation due to periods of depression and, possibly, mania," even if he stopped his substance abuse.[23]  (*Id.*).  The ALJ, however, found that  Plaintiff "would experience no episodes of decompensation if the substance use was stopped."  (R. 19).

"Episodes of decompensation" are defined by the Social Security Regulations as:

exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

20 C.F.R. Pt. 404, Subpt. P, App. 1.  And, the term "repeated episodes of decompensation, each of extended duration," as used in Paragraph B, means "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks," or some other combination of frequency and length with equally severe functional effects.  *Id.*

In making her finding that Plaintiff would not suffer any periods of decompensation, the ALJ considered Dr. Dombrovski's opinion.  However, the ALJ  rejected his conclusion because "all but one [of Plaintiff's] psychiatrist hospitalization has been directly related to drug abuse and dependence and the October 2007 hospitalization occurred only six months after claimant reportedly last used cocaine and when his cocaine dependence was in only partial remission."  (*Id.*)  The ALJ based this

---

[23]

Dr. Dombrovski does not opine specifically as to the frequency, number, or duration of Plaintiff's periods of decompensation absent substance abuse.

determination on Plaintiff's hospitalization records from Greenbriar Treatment Center, a drug and alcohol treatment facility where Plaintiff was admitted in 2002 (R. 199); hospitalization records from Titusville Hospital and Saint Vincent Health Center, where Plaintiff was admitted for a drug overdose in 2003 (R. 419-34; 200-65); his treatment by Dr. Fougerose at the Center for Mental Health from 2004 to 2006, recording, among other things, a cocaine binge in October 2005 (R. 277-83); his hospitalization records from UPMC Western Psych, where he was hospitalized twice in 2007, once after a substance abuse relapse in April and then when referred for electroconvulsive therapy by Dr. Dombrovski in October (R. 441-58; 510-23).  As the ALJ points out, his first admission to UPMC Western Psych was precipitated by a relapse of significant cocaine abuse, after 15 months of abstention from substance abuse, and Plaintiff had no psychiatric hospitalizations during the fifteen months that he was "clean." (R. 19).  The ALJ also considered other evidence of record from this fifteen month period, including the mental status examinations by Dr. Kreinbrook and Dr. Boswell, both of which indicated no significant debilitating findings.  (R. 19; 378-97; 337-41).  The ALJ further examined the remaining records from Plaintiff's fifteen month "clean" period and determined that there was no evidence that Plaintiff "had experienced any perceptual disturbances or had any problems with his thought content or thought process when not abusing drugs." (R. 19).

Plaintiff argues that during this fifteen month period of sobriety, Plaintiff was "in constant treatment" and on one occasion "was assessed a GAF score of 45 by Dr. Kreinbrook on November 11, 2006, indicating serious impairment in functioning."  (Docket No. 9 at 9-10).  Being in constant treatment is not the same as experiencing repeated episodes of decompensation, nor does the former

preclude a finding of the absence of the latter.  Indeed, in order to be found disabled, Social Security

applicants "must follow treatment prescribed by [their] physician if this treatment can restore [their]

ability to work. 20 C.F.R. Pt. 404.1530.  And, treatment can "assist in the achievement of a level of

adaptation adequate to perform" substantial gainful employment.  20 C.F.R. Pt. 404, Subpt. P, App.

1., 12.00.H.

A GAF score of 45 is also not sufficient evidence, in and of itself, to indicate an episode of

decompensation.  "Because the GAF scale does not directly correlate to the severity requirements

in the mental disorders listings, a GAF score should be considered with all of the evidence but it is

not dispositive." *Galvin v. Commissioner of Social Sec.*, C.A. No. 08-1317, 2009 WL 2177216, *1

n. 5 (W.D.Pa., Jul. 22, 2009). Further, a review of the record does not reveal any visit with Dr.

Kreinbrook on November 11, 2006.  There are notes of what appears to be a general assessment of

Plaintiff's history and conditions performed at Kreinbrook Psychological Services on November 15

of that year, although not, evidently, by Dr. Kreinbrook, where 41-50 is circled on a GAF table.  (R.

392-97).  As Defendant points out these notes also contain references to the need for Plaintiff to take

his mood medication as prescribed.  (Docket No. 14 at 13).  And, other notes from Kreinbrook

Psychological Services on that same day indicate that  Plaintiff was "excited about driver's license

being reissued after an extended suspension," and that he appeared clean and casually dressed, had

no psychomotor disturbances, good eye contact, and a normal speech rate. (R. 380, 392-7).  Thus,

considering the totality of the evidence, there is no reason the ALJ should have interpreted this as

a period of decompensation, as the Plaintiff implies in his brief.[24]

---

[24]

Plaintiff also argues that the ALJ wrongly rejected Dr. Dombrovski's opinion that Plaintiff

Accordingly, the ALJ's determination that Plaintiff would not suffer from repeated periods of decompensation if he stopped his substance abuse, and her rejection of Dr. Dombrovski's opinion on that point, were supported by substantial evidence.

## VI.    CONCLUSION

Based on the foregoing, Plaintiff's motion for summary judgment (Docket No. 8) is denied and Defendant's motion for summary judgment (Docket No. 12) is granted. Thus, the decision of the ALJ is affirmed.

An appropriate Order follows.


_s/ Nora Barry Fischer_
Nora Barry Fischer
United States District Judge


cc/ecf:  All counsel of record
Date:    February 16, 2010

---

would experience repeated periods of decompensation based on the ALJ's observation that his October 2007 hospitalization was within three months of his recent relapse and therefore partially attributable to substance abuse, because Dr. Dombrovski opined that such a correlation can only be drawn "within one month of Substance Intoxication or Withdrawal." (Docket No. 9 at 9). However, there is no evidence of when Plaintiff's period of withdrawal ceased, and in any case Dr. Dombrovski's opinion on this point was contained in his second Supplemental Report which was not presented to the ALJ and is not subject to review by this Court.